WEIL & ASSOCIATES
David Weil, Esq., State Bar No. 180420
Geoffrey W. Gill, Esq.  State Bar No. 163621
295 Redondo Avenue, Suite 203
Long Beach, CA  90803
Telephone: (562) 438-8149 / Fax: (562) 490-8416
E-mail: dweil@weilaw.com

Attorneys for Plaintiff
      MESA ENVIRONMENTAL SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MESA ENVIRONMENTAL SERVICES, INC. a California corporation,<br><br>      Plaintiff,<br><br> vs.<br><br>VITUS ENERGY, LLC,  an Alaska Limited Liability Company, *in personam*, and The Vessel  "HANNAH 2801," a  Commercial Tank Barge, U.S. Official No. 630013, and  all  of  Her  Engines,  Tackle, Accessories, Equipment, Furnishings and Appurtenances, *in rem*,<br><br>      Defendants. | CASE NO.: _____<br><br>**IN ADMIRALTY**<br><br>**VERIFIED COMPLAINT FOR MONEY DAMAGES AND FOR FORECLOSURE OF A MARITIME LIEN**<br>*IN REM* **AND** *IN PERSONAM* |

PLAINTIFF MESA ENVIRONMENTAL SERVICES, INC. alleges as follows:

## JURISDICTIONAL ALLEGATIONS

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and the Supplemental Rules for Certain Admiralty Claims, over which this Court has jurisdiction pursuant to Article III, Section 2 of the U.S. Constitution and 28 U.S.C. §1333(1).

1

2.       This Court may further exercise its subject matter jurisdiction pursuant to the Federal Maritime Lien Act, 46 U.S.C. §§ 31301, *et. seq.*

## PARTIES and VENUE

3.       Venue is proper in this District pursuant to Fed. R. Civ. P. Supplemental Admiralty Rules C(2)(c) and E(3)(a).  Specifically, venue is proper in this District because the subject Vessel against which this *in rem* action is brought is currently located within this District.

4.       Plaintiff MESA ENVIRONMENTAL SERVICES, INC. ("Plaintiff") is, and at all times mentioned in this complaint was, a corporation duly organized and existing under the laws of the State of California, with its principal place of business located in Los Angeles County California. Plaintiff is in the business of providing a broad range of industrial petro chemical, marine cleaning, maintenance and environmental services.  This lawsuit concerns a claim by Plaintiff for payment for marine cleaning services provided to the defendant Vessel.

5.       Defendant Vessel "HANNAH 2801," U.S. Official No. 630013, together with her engines, tackle, accessories, equipment, furnishings  and appurtenances (hereinafter the "Vessel"), is a vessel of the United States, is a commercial tank barge designed to transport petroleum products. The Vessel is currently located within this District, at a berth in Los Angeles Harbor, California.  On information and belief, Plaintiff alleges that the value of the Vessel exceeds $400,000.00

6.       Plaintiff is informed and believes, and on that basis alleges, that defendant VITUS ENERGY, LLC ("Defendant") is a Limited Liability Company, formed and existing under the laws of the State of Alaska, that it is doing business within the State of California without being qualified or registered with the California Secretary of State to conduct such business within the State of California, and further, that it is the owner and/or demise charter of the defendant Vessel.

////

2

7.     Plaintiff is informed and believes, and on that basis alleges, that defendant VITUS ENERGY, LLC is the owner or demise charterer of the defendant Vessel "HANNAH 2801."

8.     Plaintiff is informed and believes, and on that basis alleges, that each of the named Defendants, including the Vessel, is an agent of the others, is legally responsible for the acts of the others as described herein, and, together, the Defendants are jointly and severally liable for those actions.

## GENERAL ALLEGATIONS

9.     This is an admiralty action *in rem*, to enforce a maritime lien on defendant Vessel "HANNAH 2801," and *in personam* against defendant vessel owner or demise charterer  VITUS ENERGY, LLC.

10.     On or about December 15, 2016, Plaintiff and Defendants entered into a written agreement (the "Agreement") whereby Plaintiff agreed to clean dirty oil residue from the inside surfaces of the ten cargo tanks aboard the defendant Vessel (collectively, the "Project"), in exchange for payment by Defendants to Plaintiff of an amount that was "estimated" to be $115,000.00.  The agreed upon scope of the Project was set forth in the Agreement, as supplemented by written change orders and other communication between the parties.

11.     After the initiation of the Project, Plaintiff determined that the condition of the tanks aboard the defendant Vessel was not as represented by Defendants, and that the Project could not be completed for the amount of the initial estimate provided to Defendants. Plaintiff thereupon presented a "change order" via email, seeking approval from Defendants to proceed under a time and materials basis, with the understanding that the price for the Project would substantially exceed the initial estimate.  Defendants granted such approval on January 3, 2017 and Plaintiff continued to work on the project.  True and correct copies of the Agreement and the change order, signed by Defendant's representative, are attached hereto as Exhibit "A."

12.   Plaintiff completed the Project on or about January 27, 2017, and thereupon submitted a final invoice to Defendants, in the amount of $298,268,56. Plaintiff has demanded payment from Defendants of the amount set forth such final invoice but Defendants have refused to pay such amount or any sum at all.

## FIRST COUNT

(Breach of Agreement for Marine Services Giving Rise to a Maritime Lien for "Necessaries" on Defendant Vessel Pursuant to the Federal Maritime Lien Act,  46 U.S.C. §§ 31301, *et. seq.*)
[As to all defendants]

13.   The allegations of Paragraphs 1 through 12 are incorporated by reference and are realleged as if fully set forth herein.

14.   A contract was formed between Plaintiff and Defendant, whereby Plaintiff was obligated to complete the Project in exchange for Defendant's payment of the total amount due.  Plaintiff performed all of its obligations under said contract when it completed the Project.  Defendants breached said contract when they refused to pay the total amount due.

15.   There is now due, owing and unpaid from Defendants to the amount set forth on the final invoice, amounting to $298,268,56 plus attorneys' fees and costs as set forth in the Agreement and interest through the current date at the legal rate. according to proof.

16.   Plaintiff has incurred and will incur reasonable attorneys fees, collection costs and expenses, and may be caused to make advances and sustain damages by reason of the Defendants' breach, all in amounts not presently ascertainable.  Plaintiff will amend its pleadings to correctly allege the proper amounts when they have become known.

17.   The services provided by Plaintiff gave rise to a preferred maritime lien for "Necessaries," which may be enforced by a civil action *in rem* against the Vessel, pursuant to 46 U.S.C. §§ 31301(4) and (5), and 31342(a).

COMPLAINT

WHEREFORE, Plaintiff prays as follows:

1.     That process in due form of law according to the course and practice of this Honorable Court in the exercise of its Admiralty and Maritime jurisdiction issue, in the form of a warrant for arrest, against the defendant Vessel "HANNAH 2801," a Commercial Tank Barge, U.S. Official No. 630013, and all of Her Engines, Tackle, Accessories, Equipment, Furnishings and Appurtenances, and that all persons claiming an interest in the vessel be cited to appear and answer on oath, all and singular, the matters aforesaid; and

2.     That claims of Plaintiff stated in this Complaint be declared to be a valid and subsisting preferred maritime lien in favor of Plaintiff in the amount of $298,268,56 as described above, plus interest accruing at the legal rate from the date of Plaintiff's claim and attorneys' fees and costs according to proof, together with all other amounts which have been or are required to be disbursed by Plaintiff for the care, insuring, preservation, storage, and mooring of the defendant Vessel, and all other advances, expenses, attorneys' fees, costs and disbursements by Plaintiff, all with interest accruing at the legal rate from the date of this Complaint, such lien to be prior and superior to the interest, liens or claims of any and all persons, firms, or corporations whatsoever; and

3.     That judgment be entered in favor of Plaintiff and against Defendants for the total amount of Plaintiff's claim, $298,268,56 as described above, plus interest accruing at the legal rate from the date of Plaintiff's claim and attorneys' fees and costs according to proof, together with all other amounts which have been or are required to be disbursed by Plaintiff for the care, insuring, preservation, storage, and mooring of the defendant Vessel, and all other advances, expenses, attorneys' fees, costs and disbursements by Plaintiff, all with interest accruing at the legal rate from the date of this Complaint; and

COMPLAINT

4.     The Court award Plaintiff its attorneys' fees, costs, and other expenses incurred in connection with this proceeding, including and without limitation, all costs incurred in *custodia legis* as may be established at trial or otherwise awarded; and

5.     That the Court foreclose on the lien of Plaintiff's said claim mortgage by sale of the  defendant Vessel  "HANNAH  2801," U.S. Official No. 630013, that Plaintiff may credit bid on the Vessel without cash deposit the amount due and owing up to the full amount thereof, and that the proceeds from the sale of the Vessel be applied to pay the cost of seizure, safekeeping, and sale of the defendant Vessel, and, then toward payment of the sum adjudged owing to Plaintiff; and

6.     That it be decreed that any and all persons, firms, or corporations claiming any interest in the defendant Vessel "HANNAH  2801," U.S. Official No. 630013 are forever barred and foreclosed of and from all right or equity of redemption or claim of, or in, or to the Vessel and every part thereof; and

7.     That Plaintiff recover from all Defendants, jointly and severally, the amount of any deficiency including attorneys' fees, expenses and costs that may be due Plaintiff  after applying the proceeds of the sale of the mortgaged vessel to the amount of the decree herein; and

8.     For costs of suit herein incurred; and

9.     For such further relief as this Court may consider proper.

Dated:  March 13, 2017

WEIL & ASSOCIATES

By: **/s/ David Weil**
David Weil, Esq.
Attorneys for Plaintiff
MESA ENVIRONMENTAL SERVICES, INC.
E-mail: dweil@weilaw.com

6

COMPLAINT

## **VERIFICATION**

I, JOE ORTEGA, declare,

1.    I am a President of MESA ENVIRONMENTAL SERVICES, INC. plaintiff in the above cause and claimant with regard to the Preferred Maritime Lien held on the defendant Vessel "HANNAH 2801," U.S. Official No. 630013 which is the subject of the attached complaint.

2.    I have read the foregoing Complaint and know the contents.  The Complaint is true of my own personal knowledge, except as to those matters which are stated on information and belief, or those matters which are stated to have been observed by others, or those matters about which the court may take judicial notice and, as to each of those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct, and that this declaration was executed in _Signal Hill_, California on _March 13th_, 2017.


_____
JOE ORTEGA

8

COMPLAINT

# EXHIBIT "A"

# EXHIBIT "A"



## CONSTRUCTION SERVICES AGREEMENT

This Construction Services Agreement ("Agreement") is made this __15__ day of __December__, 20_16_, by and between Vitus Energy, LLC, herein referred to as "Company", whose address is 113 W. Northern Lights Blvd., Suite 200, Anchorage, AK 99503, and Mesa Environmental Services Inc., , herein referred to as the "Contractor," whose address is 1444 E. Burnett St. Signal Hill Ca. 90755 .

1. Scope and Timing of Performance of Work. Company engages Contractor to perform, and Contractor agrees to perform, all of the Services described in Exhibit A hereto, the terms of which Exhibit A are incorporated herein by this reference, inclusive of all the materials and equipment to be furnished in connection with the work, and all tools, machinery, and supervision necessary for the performance of the work (collectively, the "Work"). Contractor will commence performance of the Work not later than December 20, 2016 and will complete the Work not later than Estimated December 31 2016. TIME LIMITS STATED IN THE AGREEMENT ARE OF THE ESSENCE OF THE CONTRACT. By executing the Agreement the Contractor confirms that the contract time is a reasonable period for performing the work.

2. Compensation and Invoices. Contractor shall be paid $ Estimated 115,000.00 for the Work. Contractor shall invoice Company upon completion of the Work, and Company shall pay the invoice within thirty (30) days after receipt thereof; provided, however, that payment shall not become due until:

      2.1 Contractor has delivered to Company all lien releases and waivers required by Sections 5 and 6 of this Agreement;

      2.2 Contractor has performed all of its obligations under Section 8.4 of the Agreement; and

      2.3 Company has inspected and accepted all Work, including the performance of punch list items, as being in conformity with the Contractor's obligations under this Agreement.

Contractor shall not perform, or be compensated for the performance of, any work other than the Work described in Exhibit A, without the express prior written approval of Company.

3. Standard of Care. Contractor shall exercise such care and professional expertise as is consistence with that level of care and expertise ordinarily exercised by members of Contractor's industry or profession and shall perform in accordance with best industry or profession practices. All Work that needs to be inspected or tested and certified by an engineer or local building inspectors shall be inspected or tested at each necessary stage before further construction continues.

4. Independent Contractor. Contractor will perform the Work as an independent contractor of Company, and Contractor will retain full control over the manner in which the Work is performed. This Agreement will not be construed to create a partnership, joint venture, or employment relationship between Contractor and Company. Neither Contractor nor any employee or agent of Contractor will represent herself or himself to be an employee or agent of Company. Neither Contractor nor Contractor's employees or agents shall have any authority to



bind, obligate or commit Company by any promise, representation, or act, and neither Contractor nor Contractor's employees or agents shall make any promise or representation or do any act that is inconsistent with this paragraph.  Neither Contractor nor Contractor's employees or agents will be employees of Company during the work for which contractor is employed or entitled to workers' compensation, retirement, insurance or other benefits afforded to employees of Company.

5.  Subcontracts.  Contractor may not subcontract any of the Work without Company's advance written consent, which consent may be withheld or made subject to conditions at Company's absolute discretion.  Without limiting the foregoing, Contractor shall insure that any subcontractor to which Company consents agrees to be bound by all of Contractor's covenants to Company and to look solely to Contractor for payment, and Contractor shall not be entitled to payment until such subcontractor provides Company with a complete release of all liens arising out of the Work.

6.  Liens and Lien Waivers.  Without limiting Section 5, Contractor shall provide Company with a signed lien release from each person, company, or other entity supplying materials and/or services as part of the contracted Work.  Such lien releases shall be a complete release of all liens arising out of the Work and shall be signed by such person, company or other entity.  Contractor shall not be entitled to payment until such lien releases have been provided to Company.

6.1  In the event Company receives information that indicates a lien has been filed or that there exists a potential lien situation, the Contractor will be notified by Company and the Contractor shall immediately resolve the situation to the satisfaction of Company.  The Contractor further expressly undertakes to defend Company, at the Contractor's sole expense, against any actions, lawsuits or proceedings brought as a result of liens filed against the Work, the site of any of the Work, the Project site and any improvements thereon or any portion of the property.  The Contractor hereby agrees to indemnify and hold Company harmless against any such liens or claims of liens and agrees to pay any judgment or lien resulting from any such actions, lawsuits or proceedings.

6.2  Notwithstanding anything to the contrary contained herein, if the Contractor does not promptly remedy any lien or claim of lien, Company may withhold the amount of such lien until such lien is discharged.  If not monies are available to be withheld, the Contractor shall within three (3) consecutive calendar days refund to Company 150% of such lien(s).

6.3  In the event the Contractor fails to make payments to its subcontractors, sub-subcontractors, materialmen or suppliers in accordance with this Agreement and does not provide justifiable reasons to Company upon Company's request, Company may, at its sole discretion, elect to make any payment requested by a subcontractor of any tier, jointly payable to the Contractor and each subcontractor, sub-subcontractor, materialmen and/or supplier.  In no event shall any joint payment be construed to create any (i) contract between the Company and a subcontractor of any tier, (ii) obligations from the Owner to such subcontractor, or (iii) rights in such subcontractor against Company. The Contractor agrees to sign such additional documents and take such action as the Owner shall deem necessary to carry out the intent of this section.



7. Insurance.

    7.1  At all times during the term of this Agreement, Contractor shall maintain, at its own expense, the following insurance issued by insurers authorized to engage in the business of insurance in the State of Alaska:

        (a)  Comprehensive general liability insurance (bodily injury and property damage) of not less than $_____ combined single limit per occurrence, $_____ combined single limit annual aggregate;

        (b)  Auto liability insurance (bodily injury and property damage) of not less than $_____ combined single limit, and $_____ uninsured motorist liability, on autos owned by Contractor;

        (c)  Worker's compensation insurance covering all of Contractor's employees in amounts required by law; and

        (d)  Any other insurance or surety bonding that Contractor may be required to maintain under applicable Federal, state and local laws and regulations.

    7.2  Before commencing the Work, Contractor shall furnish certificates reasonably satisfactory to Company as evidence that the insurance required under Section 7.1 is being maintained.  The insurance company(ies) shall have no recourse against Company for payment of any premiums or assessments under any policy issued by any insurance company to Contractor.

    7.3  All required liability insurance shall name Company, its directors, officers, employees, agents and consultants as  additional insureds (except as respects Workers' Compensation) with waiver of subrogation and reflect the same in the required certificates.

    7.4  The Contractor's liability policies shall be designated primary coverage for both defense and indemnity and any policy of insurance purchased or maintained by Company shall be excess and noncontributory to insurance purchased and maintained by Contractor.  All subcontractors and sub-subcontractors shall comply with the insurance requirements of this Section 7.3, provided that Company may upon request relax the limits requirements for certain less critical subcontractors upon request of Contractor. All subcontractors shall obtain a Broad Form Additional Insured Endorsement to its commercial general liability policy in form CG 20 10 11 85 or equivalent.

    7.5  The existence of insurance shall not reduce or limit any of Contractor's obligations or liability under this Agreement, including without limitation Contractor's obligations under Section 9 (Indemnification).

8. Warranties.

    8.1  Contractor warrants and declares that it has carefully examined and has full knowledge and understanding of the proposed Work, including any drawings or specifications provided by Company. Contractor warrants and declares that it has carefully investigated and has full knowledge and understanding of,

PU 015VE Construction Services Contract     Rev #0 Dated 3/25/15



and is satisfied with the site and all conditions and other matters which might affect performance or cost of the Work, including without limitation: transportation; the disposal, handling and storage of materials; the availability of labor, water, electrical power, and roads; the uncertainties of weather; the physical conditions at the site including the conformation and conditions of the ground and/or soil, and the character, quality and quantity of surface and subsurface materials; the tools, machinery, and facilities needed to perform the Work; and any obstacles that may be encountered in performing the Work. Contractor agrees that it bears the risk of any unknown or unforeseeable conditions or obstacles, and Contractor shall not be relieved of its obligations under this Agreement as a result of any unknown or unforeseen conditions or obstacles.

8.2  In addition to any warranties specified elsewhere or provided by law, Contractor warrants that all materials and equipment furnished will be new, and that all materials and equipment furnished, and all Work performed, will be of the highest quality and will be free from faults, defects, or faulty design.

8.3  Contractor, at its own expense, shall promptly repair or replace all such materials, equipment or Work which fail to conform in any respect to any warranties herein if such failure is discovered during the progress of Work or within one (1) year after acceptance by Company. The warranty covering any materials or equipment or any part of the Work that is replaced or repaired by Contractor under the above conditions shall be reinstated for a period of twelve (12) months from and after said replacement or repair. If the Contractor fails to proceed to comply with the terms of its warranties within thirty (30) calendar days of notification of any defect or other failure, Company may have the materials, equipment, or Work replaced or corrected and Contractor shall be liable for all costs incurred therefore. The foregoing shall not be exclusive remedies, and Company shall also have such other remedies as are available at law and in equity.

8.4  The Contractor will obtain from manufacturers, materialmen, and (without limiting Section 5) subcontractors and sub-subcontractors, and furnish to Company all written guarantees and warranties, and will transfer or assign to Company such guarantees and warranties as run in favor of the Contractor, prior to the time the Contractor receives final payment. The guarantees and warranties shall be in addition to and not limited by any other provisions of this Agreement, or any guarantee or remedy required by law.

8.5  Contractor acknowledges that it is responsible for the supervision and direction of its employees and for assessing the ongoing safety of its worksite/work area.

9.  Indemnification.  To the fullest extent permitted by law, Contractor shall indemnify, defend and save Company harmless from and against all liabilities, losses, claims, penalties, forfeitures, demands, suits, judgments, expenses, attorneys' fees and costs ("Claims"), including without limitation any and all Claims in connection with bodily injury, including death, to persons or damage to tangible property, arising out of or related to the following, even if such Claims are due in part to the negligence or other fault of Company, and excepting only and then strictly only to the extent that such Claims are due to the exclusive negligence of Company:  (i) any act or omission of Contractor, its officers, directors, employees, agents, subcontractors, sub-subcontractors, materialmen, supppliers, and each of them, in connection with the Work or this Agreement; (ii) any act or omission of Contractor, its officers, directors, employees, agents, subcontractors, sub-subcontractors, materialmen, supppliers, and each of them, done in, on or about property or premises owned, occupied, or



operated by Company; (iii) any lien or right to payment asserted by any person, company, or other entity supplying materials and/or services as part of the contracted Work; or (iv) Contractor's breach of any term or condition of this Agreement. For purposes of this Section 9, "Company" includes Company and its officers, directors, agents, shareholders, owners, employees, trustees, administrators, sureties, insurers, attorneys, parent and subsidiary and affiliates, successors and predecessors in interest, assigns and receivers, and each of them, past, present and future.

10. Right of Periodic Review; Right to Stop Work. Company shall have the right, at all times, to review and evaluate materials and equipment as they are being furnished, and Work as it is being performed, by Contractor; provided, that Company shall have no obligation to undertake such review or evaluation. If Contractor fails to supply necessary materials or equipment for the timely performance of the Work, or if Company determines that the materials, equipment, or Work fail to comply with Contractor's warranties or other obligations herein, then Company may order Contractor to stop the Work, or any portion thereof, until Contractor remedies those failures which gave rise to such order.

11. Termination for Convenience. This Agreement may be terminated by Company at any time for convenience upon ten days' written notice to Contractor.

    11.1  In the event Company terminates the Agreement for convenience:

        (a)  Upon receipt of the termination notice, Contractor shall promptly discontinue all Work, unless directed otherwise; and deliver to Company all data, reports, summaries, estimates, and any other information or materials as may have been collected or created in performing the Work.  Contractor is not entitled to payment under Section 11.1(b) until the foregoing items have been delivered to Company.

        (b)  Company will pay Contractor the reasonable value of all Work rendered by the Contractor through the effective date of the termination; provided that such payment will not exceed the contract price.

        (c)  If Contractor has received payments prior to termination in excess of the amount to which it would be entitled under Section 11.1(b), it will remit the excess payments to Company within thirty (30) days.

        (d)  Contractor shall not be entitled to any compensation and shall have no recourse against Company beyond that provided for in this Section 11.1.

    11.2  If Company terminates the Agreement for default, and the Contractor is thereafter determined by a court of competent jurisdiction not to have been in default, then the termination shall be treated as a termination for convenience.

12. Termination for Default. Either party may terminate this Agreement in the event of a material default by the other party, provided that the defaulting party is first given notice of the default and the default is not cured within ten days from the date of such notice.

PU 015VE Construction Services Contract      Rev #0 Dated 3/25/15



12.1  In the event the Agreement is terminated on account of the Contractor's default:

(a)  Contractor shall promptly deliver to Company all data, reports, summaries, estimates, and any other information or materials as may have been collected or created in performing the Work; and

(b)  Contractor shall be liable for all damages arising out of Contractor's breach, and Company shall have rights and remedies provided by law, which rights and remedies shall be cumulative and may be exercised concurrently.   Without limiting the foregoing sentence, Company's rights in the event of termination for default shall include the right to contract with a third party for the performance or completion of the Work, and the right to recover damages for the amount by which the total amount paid to Contractor and such third party exceeds the price to be paid under this Agreement.

13.  <u>Hazardous Substances/Environmental Laws.</u>  Contractor shall promptly notify Company  upon becoming aware of the following: (a) any spill, leak, disposal or other release of a Hazardous Substance on, under, or adjacent to Company Property, or reasonable suspicion of the same; (b) any notice of communication from a governmental agency or any other person related to any Hazardous Substance on, under or adjacent to Company Property, or relating to any Environmental Law; or (c) any actual, suspected, or alleged violation of any Environmental Law with respect to Contractor's activities on or in connection with Company's Property, as well as those of its subcontractors, sub-subcontractors, materialmen, suppliers or agents.  As used in this Section, "Company Property" is defined as property or premises owned, occupied, or operated by Company. The provisions of this section shall survive completion or termination of this Agreement.

13.1.  As used in this section, the term "Hazardous Substance" means any hazardous, dangerous, toxic or harmful substance, material or waste, including biomedical waste, which is or becomes regulated by any local governmental authority, the State of Alaska, or the United States.

13.2  Without limiting Contractor's indemnity obligations under Section 9, in the event of a leak, spill or release by Contractor, its subcontractors, sub-subcontractors, materialmen, suppliers or agents, of a Hazardous Substance on or adjacent to Company Property which Contractor is working, or in the event of a violation of any Environmental Law by any such persons, Contractor shall immediately undertake all emergency responses necessary to contain, clean-up and remove any Hazardous Substance and shall undertake within a reasonable time all investigatory, remedial and/or removal action necessary or appropriate, including without limitation any action required by any governmental authority, to ensure that any contamination by the Hazardous Substance or resulting from the violation is eliminated. Moreover, within three (3) days after completion of such investigatory, remedial and/or removal action, Contractor shall provide Company with a certification reasonably required by Company that all such contamination was eliminated.

14.  Cleaning Up.  The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Agreement. At completion of the Work, the Contractor shall remove waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus material from and about the Project.



15.  <u>Licenses; Compliance with the Law; Taxes</u>.  Contractor shall acquire and maintain in good standing all permits, licenses and other entitlements necessary to its performance of this Agreement.  All Work and all actions taken by Contractor in the performance of this Agreement shall comply with all applicable statutes, ordinances, rules and regulations, including without limitation all building and code regulations and ordinances whether or not specified in the Work or any specifications or drawings for the Work, and those pertaining to the protection of health, safety, or the environment.  Contractor shall pay all taxes imposed on Contractor in connection with the performance of this Agreement or with respect to any amounts payable to Contractor under this Agreement.

16.  <u>Liquidated Delay Damages</u>.  If the Work is not completed within by the date provided for in Section 1, Contractor will pay Company liquidated delay damages of $_____ per day for each day of delay.  Contractor acknowledges that actual damages for delay would be difficult to determine with certainty, and agrees that the foregoing liquidated delay damages are a reasonable estimate of the damages that would be sustained by Company on account of Contractor's delay in completing the Work.  Company's right to recover the foregoing liquidated delay damages is in addition to Company's right to recover damages for other injuries (i.e., other than for delay) which may be sustained by reason of Contractor's breach, and is in addition to any other remedies Company may have under this Agreement or at law or equity, including without limitation Company's rights and remedies under Section 12.1(b).

17.  <u>Notices</u>.  Any notice, correspondence and billing shall be delivered by hand or mail to the parties at their respective above-stated addresses.

18.  <u>Assignment; Successors and Assigns</u>.  Contractor may not assign its interest in this Agreement without the prior written consent of Company, which consent may be withheld or made subject to conditions at Company's absolute discretion, and no assignment shall operate to relieve Contractor of its obligations under this Agreement.  Any attempted assignment in violation of this section shall be void.  Without limiting the foregoing, this Agreement shall inure to the benefit of and binding upon the parties hereto and their respective successors and permitted assigns.

19.  <u>Waiver</u>.  The waiver by either party of a breach of any provision of this Agreement shall not operate as or be construed as a waiver of any subsequent breach thereof.  No omission, delay or failure on the part of any party in exercising any rights hereunder, and no partial or single exercise hereof, will constitute a waiver of such rights or of any other rights hereunder.

20.  <u>Severability</u>.  If any section, sentence or clause of this Agreement shall be found by a court of competent jurisdiction to be illegal or unenforceable, such illegality or unenforceability shall not affect the validity of this Agreement as a whole or any other section, sentence or clause.

21.  <u>Attorney Fees and Costs</u>.  In the event of any action between the parties to enforce the terms of this Agreement or arising from the breach of any provision of this Agreement, the prevailing party will be entitled to recover its reasonable attorney fees and expenses incurred.



22. Governing Law and Venue. The validity, meaning and effect of this Assignment shall be determined in accordance with the laws of the State of Alaska. Venue in any dispute arising out of or relating to this Assignment shall lie exclusively in the state or federal courts at Anchorage, Alaska.

23. Survival of Terms. The parties' rights and obligations under Sections 8 and 9 of this Agreement shall survive expiration or other termination of this Agreement. In addition, any other terms, conditions and warranties contained in this Agreement that by their sense and context are intended to survive the completion of the Work shall so survive completion of performance, expiration or termination of the Agreement.

24. Integration. This Agreement, including all exhibits hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof. No modification shall be binding unless in writing and signed by both parties.

Vitus Energy, LLC

By:_____
Its:_____

CONTRACTOR:

_____

By:_____
Its:_____President_____

PU 015VE Construction Services Contract        Rev #0 Dated 3/25/15

**EXHIBIT A**
<u>DESCRIPTION OF WORK</u>

Provide supervision, labor and equipment to squeegee scrape, spray down with diesel pressure wash with 250 degree hot water and soap 10 cargo tanks. Pipeline will be flushed with 225 degree water, and then packed with diesel let it set then triple rinsed with 225 degree water and soap. haul off oily water to Las Palmas for dehration and recycling of oil transported on a bill of lading. We will need a EPA number in order to dispose of the PPE oily debri disposal to republic for disposal.

 **ENVIRONMENTAL SERVICES, INC.**

January 3, 2017

Vitus Marine
Attn: Justin

Re: Change Order Letter for work authorization

We have already came up to estimation that was originally given to your company for the estimation to clean 10 tanks for change of product. As we all know we were unable to enter tanks to walk before estimate was given. We gave you a ballpark estimated cost which was $11,500.00 per tan. These 10 tanks and pipeline are covered in asphalt/tar type of oil walls had in most place over half inch thick of very tacky oil and floor contained 3 barrels of loose oil and 2″ to 3″ of heavies which equaled up to be 10 to 15 BBLs per tank except for 4pt and 5pt, 4pt contained 10″ of heavy oil that had to be broken up with diesel 5pt contained 8″ of slurry. We are currently still in process of getting #1s ready we have been using diesel , soap and 205degree water and there are still spots that need to be addressed before we move out of tanks to #25 and #2p. Also pipeline has been filled and dropped 5 times we still need to hit deep wells (1) more time. We have already donated 4,700 gallons of diesel to this project we will be needing some more diesel to scrub down wall and scrap in the rest of tanks this letter I am addressing you with is to let you know we are already up to estimated price and we will need permission to continue the cleaning on the barge Hannah please sign and send back so that we can continue to finish up this project

Cost as up to 12/31/2016                    $118,374.36

Thank you,

Eric Ortega
EEO:so